976 F.2d 728
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
David Eugene DAVENPORT, Defendant-Appellant.
 No. 91-5910.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 1, 1992
Decided: September 11, 1992
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. T. S. Ellis, III, District Judge. (CR-91-277-A)
 Lloyd Foster Sammons, Alexandria, Virginia, for Appellant.
 Arthur S. Lowry, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.
 Richard Cullen, United States Attorney, John Smeltzer, Special Assistant United States Attorney, Alexandria, Virginia, for Appellee.
 E.D.Va.
 AFFIRMED.
 Before WIDENER and NIEMEYER, Circuit Judges, and LEGG, United States District Judge for the District of Maryland, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 David Davenport appeals his bench trial conviction of conspiracy to distribute crack cocaine in violation of 21 U.S.C. § 846 (1988). Prior to receiving a nonjury trial on his conspiracy charge, Davenport pled guilty to two counts of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1988). Appellant argues only that the evidence before the district court was insufficient to sustain his drug conspiracy conviction. Because we find the evidence sufficient to support his conviction, we affirm the judgment of the district court.
 
 I.
 
 2
 Davenport was indicted by a federal grand jury on three narcotics counts. The government charged that Davenport participated in a crack cocaine distribution ring run by a ringleader named "Tony" that operated in Washington, D.C. and the surrounding suburbs. At trial, the government's sole witness, Drug Enforcement Administration Agent Douglas Comfort, testified that on three separate occasions, Davenport "fronted" crack cocaine on behalf of"Tony" by collecting cash from Agent Comfort, and later providing the agent with an ounce of crack cocaine.
 
 
 3
 During their initial conversation, Davenport informed Agent Comfort that he dealt crack cocaine through a unnamed source, later identified by Davenport as "Tony." Davenport also referred to "this Jamaican that I deal with," and suggested that Agent Comfort "check our product." (J.A. 101-02). He explained to Agent Comfort during their first transaction that for security reasons it was "Tony's" practice to distribute his drugs from his car, using a network of dealers who also operated from their cars and with whom "Tony" communicated by cellular phone.
 
 
 4
 During the first of the three drug transactions, Agent Comfort gave Davenport $1625.00 and then spent several hours driving with him to different pay telephone locations as Davenport attempted, with little initial success, to link up with "Tony" in order to obtain the drugs. Agent Comfort testified that while his vehicle was parked near one such pay phone location, two men slowly drove past him in another vehicle, looking carefully at him. Soon thereafter, Davenport returned to Agent Comfort's vehicle, saying that he had seen"them" drive by and wave. Davenport further told the agent that"Tony" had wondered why a "white boy" was buying crack in Prince George's County. (J.A. 68, 82). Davenport explained to Agent Comfort that the delays had been caused by his cousin, who kept missing a "hook-up" with "Tony."
 
 
 5
 After he acquired his first drug purchase from Davenport, Agent Comfort weighed the crack cocaine and found that the package contained less than an ounce. He complained about this shortage to Davenport and asked to meet with "Tony" directly. Davenport, however, informed Agent Comfort that "Tony" never met directly with his customers, but that Davenport would speak to "Tony" about the shortage. The following day, Davenport told Agent Comfort that he had met with "Tony," who maintained that the proper weight of drugs had been given to the agent. Davenport then agreed to reduce the price of the second purchase in order to resolve the problem.
 
 
 6
 During the next couple of weeks, Agent Comfort met with Davenport at the Vienna Metrorail Station in Vienna, Virginia on two separate occasions. Each time, Agent Comfort gave a specified sum of cash to Davenport and then waited for Davenport to call and inform him as to when and where the crack cocaine would be delivered. Each time, Davenport conveyed the crack cocaine to Agent Comfort the following day. The agent noted at trial that, upon returning a page during the second transaction, he was required to call one of the pay phone numbers used by Davenport during the first transaction.
 
 
 7
 During this time period, Davenport told Agent Comfort that "Tony" set the price for his deals and informed Comfort that "Tony" wanted to start selling a minimum of two ounces per transaction. Agent Comfort then discussed the possibility of buying as much as four ounces. Davenport told the agent that he would have to speak to "Tony" first about setting a price for the sale of four ounces. Although the two men later agreed upon a two-ounce purchase, Davenport was arrested before a fourth deal was completed.
 
 
 8
 After his arrest, and after receiving Miranda warnings, Davenport reaffirmed that "Tony" was his source for all three purchases. He stated that his cousin had obtained crack from "Tony" for the first transaction and that he, himself, went directly to"Tony" for the second and third transactions. Specifically, as to the third transaction, Davenport stated that he gave the cash to "Tony" while "Tony" was in his car, that "Tony" then made a call from his cellular phone, and that a second car arrived with the drugs. Davenport also stated that "Tony" distributed approximately two to three kilos of crack per month, employing between ten and twenty "runners" to facilitate his sales. (J.A. 108-09).
 
 II.
 
 9
 A reviewing court must uphold a guilty verdict challenged for insufficiency of evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This Court must consider both circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established. United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982).
 
 
 10
 In order to establish a violation of 21 U.S.C. § 846, the Government must prove: (i) the existence of an agreement between two or more persons to engage in conduct that violates a federal drug law, and (ii) that the defendant voluntarily became a party to that agreement. United States V. Clark, 928 F.2d 639, 641-42 (4th Cir. 1991). A conspiracy need not be proven by direct evidence and, indeed, is often proven circumstantially, based upon the relationship existing between the alleged conspirators and the nature of their conduct. United States v. Guinta, 925 F.2d 758, 764 (4th Cir. 1991); United States v. Brown, 856 F.2d 710, 711-12 (4th Cir. 1988).
 
 III.
 
 11
 Davenport argues that Agent Comfort's testimony was speculative as to appellant's conspiratorial involvement and that the government presented no direct evidence linking Davenport with a conspiracy to distribute. There is, however, substantial evidence to support Davenport's conviction for conspiracy to distribute cocaine. The government's evidence shows that the actual structure of Davenport's drug transactions was dictated by "Tony" in terms of: (i) the amount sold, (ii) the price of the drugs, (iii) the actual weight of the drug product given to Agent Comfort, and (iv) the timing of the exchange of monies and of the conveyance of the drugs themselves. Indeed, the record indicates that "Tony" was sufficiently interested in Agent Comfort's purchase that he drove by to inspect his new customer.
 
 
 12
 Moreover, the Court agrees with the government's argument that it was not required to prove that Davenport knew all of the details of the conspiracy as long as it demonstrated that (i) Davenport had knowledge of the conspiracy's "essential objects," United States v. Goldman, 750 F.2d 1221, 1227 (4th Cir. 1984), and (ii) that he took some affirmative action showing participation in the drug conspiracy. United States v. Watkins, 662 F.2d 1090, 1097 (4th Cir. 1981), cert. denied, 455 U.S. 989 (1982).
 
 
 13
 Davenport repeatedly acknowledged that "Tony" was the source of the crack and that "Tony" further determined the quantity and price of the crack sold to Comfort. (J.A. 83, 86, 97). We find that Davenport's actions, his deference to "Tony's" decisions, and his acknowledgement of "Tony's" question as to why a white boy was buying crack, reveal that Davenport was acting within the parameters of an implied agreement with "Tony."
 
 
 14
 Such evidence also abrogates Davenport's argument that he did no more than buy drugs from Tony and sell them in independent deals. If this had been the case, then Davenport and the agent would not have been required to spend several hours trying to"hook-up" with "Tony," there would have been no delayed price negotiations for the four-ounce purchase proposed by Agent Comfort, and it is likely that Davenport would not have taken an average of twenty-four hours to obtain Agent Comfort's drug purchases. Finally, we note that the evidence showed that Davenport obtained sufficient amounts of drugs on such a frequent basis that "Tony" should have known that he was supplying Davenport in his role as a dealer. See United States v. Mancari, 875 F.2d 103, 105 (7th Cir. 1989).
 
 
 15
 As noted above, the government's evidence shows that"Tony" assumed an active role in Davenport's distribution scheme. Because we find that there was sufficient evidence to support Davenport's conviction on the drug conspiracy count, we affirm his conviction.
 
 AFFIRMED