60 F.3d 826
NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Theodore Anthony MAXWELL, a/k/a Little Hitler, a/k/a Hitler,
a/k/a Ferdinand Clarkson, a/k/a Maxwell Spencer,
a/k/a Tony Johnson, a/k/a Spencer
Maxwell, Defendant-Appellant.
 No. 94-5355.
 United States Court of Appeals, Fourth Circuit.
 Argued: November 3, 1994.
Decided: July 5, 1995.
 
 ARGUED: David Lawrence Arnold, Pender & Coward, Virginia Beach, VA, for Appellant. Carol M. Marx, Special Assistant United States Attorney, Norfolk, VA, for Appellee. ON BRIEF: Helen F. Fahey, United States Attorney, Norfolk, VA, for Appellee.
 Before ERVIN, Chief Judge, WIDENER, Circuit Judge, and PHILLIPS, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Appellant Theodore Maxwell appeals from his convictions on four counts, of conspiracy to distribute and to possess with intent to distribute cocaine and cocaine base, 21 U.S.C. Sec. 846 (Count One); distribution and possession with intent to distribute approximately one-half kilogram of cocaine and cocaine base, 21 U.S.C. Sec. 841(a)(1)(2) (Count Thirty-Three); possession of a firearm while in possession of a controlled substance, 18 U.S.C. Sec. 924(c)(1) (Count Thirty-Five); and being a convicted felon in possession of a firearm, 18 U.S.C. Sec. 922(g)(1) (Count Thirty-Seven). Maxwell argues that the district court improperly denied him the opportunity to cross-examine adverse witnesses regarding their motivations to fabricate testimony against him, and that his motion for judgment of acquittal on all four counts was improperly denied because the evidence as to each count was insufficient to support a jury verdict against him. We affirm Maxwell's convictions in all respects.
 
 
 2
 Maxwell does not dispute the existence of a drug conspiracy[1] as well as his association with several members of the conspiracy, both socially and for the purpose of buying or selling drugs. Maxwell argues, however, that even when the evidence is viewed in the light most favorable to the government, there was not substantial evidence to support the verdict against him. See Glasser v. United States, 315 U.S. 60, 80 (1942). He denies any involvement with the conspiracy.
 
 
 3
 In the light most favorable to the government, the facts are as follows. Maxwell, Miller, Miss Ware, and two unindicted coconspirators named Bruce Samuels and Clive McDermott lived together at various times and in various locations in the Eastern District of Virginia between late 1988 and April 1991. Cocaine was distributed from and stored at these locations. Witnesses saw Miller, the leader of the conspiracy, give cocaine to Maxwell. Miller and Miss Ware both testified that Maxwell knew where Miller hid cocaine and crack and was permitted by Miller to take amounts of cocaine from those locations and replace it with the money received from sales of the cocaine he took. Maxwell bought or sold crack cocaine on at least five occasions, including two sales of one-half kilogram each. Maxwell accompanied Miller to New York to purchase cocaine for resale, and helped Miller cook cocaine into crack and weigh it for resale.
 
 
 4
 In June 1991, Maxwell, Miller, McDermott, and an otherwise unidentified man named John John entered the apartment of a rival drug dealer, Bruce Samuels, intending to rob a man named Matthews of money, guns, and drugs. When the robbers arrived, they subdued the occupants, Samuels, Samuels' girlfriend, and a man named Witter. Miller went to Samuels' bedroom and found several guns, an Uzi and a "Dillinger," and gave the Uzi to Maxwell. When a man named Wheatley entered the apartment, Maxwell held the Uzi on him while Miller searched and robbed him. When Matthews arrived at the apartment, Miller beat him with a bat, and Miller, Maxwell, and McDermott "grabbed him" and asked, "where's the stuff at?" Matthews eventually revealed that there was approximately one-half kilogram of cocaine in his car, which was outside the apartment. McDermott went to the car and retrieved the cocaine. Several of the robbers then left Samuels' apartment and went to Matthews' apartment to find more of Matthews' valuables. Maxwell remained, holding the occupants at gunpoint. When the others returned with money and a gun from Matthews' apartment, Maxwell and his accomplices left Samuels' apartment. They then met to discuss what they would do with the drugs and other proceeds of the robbery.
 
 
 5
 Maxwell was indicted in August 1992 and arrested in August 1993. In October 1993, Maxwell's trial commenced. Several of his coconspirators testified against him under plea agreements in which the government promised to move the court for a substantial-assistance departure. The district court sustained the government's objections to several questions asked by Maxwell's counsel during the cross-examination of McDermott, an unindicted co-conspirator who testified against Maxwell in exchange for the government's promise of a substantial-assistance motion in McDermott's unrelated prosecution, regarding McDermott's understanding of the substantial-assistance procedure. Maxwell was found guilty on all four counts, his motion for judgment of acquittal was denied, and he was sentenced to 292 months' imprisonment each on Counts One and Thirty-Three, to run concurrently with each other, 120 months on count Thirty-Seven to run concurrently with Counts One and Thirty-Three, and 120 months on Count Thirty-Five, to run consecutively to all other counts.
 
 I.
 
 6
 Maxwell's first argument on appeal is that the district court and the government denied him due process by preventing him from cross-examining witnesses as to their subjective beliefs that the United States Attorney and the investigating agent in the case could and would give the witnesses favorable treatment in exchange for their testimony. This argument stems from the following dialogue, which occurred among Mr. Arnold, Maxwell's counsel, Miss Marx, the Assistant United States Attorney, McDermott, and the district court, at Maxwell's trial:
 
 
 7
 MR. ARNOLD: To your knowledge, now, is it fair to say that the substantial assistance works on a sliding scale? In other words, the more help you provide, the more time you can get cut? If you don't provide any help, then you don't have--
 
 
 8
 MS. MARX: Your Honor, there's no indication that Mr. McDermott knows how substantial assistance works at all.
 
 
 9
 COURT: The question is improper. As a matter of fact, it isn't true. I'm the one who gives out substantial assistance credit when it comes necessary, and it doesn't develop by how much. That may have some effect in it, but not totally. Go ahead, Mr. Arnold.
 
 
 10
 ....
 
 
 11
 MR. ARNOLD: Mr. McDermott, who decides whether you'll get your sentence reduced?
 
 
 12
 ....
 
 
 13
 McDERMOTT: Mr. Sochor [the INS investigating agent in charge of the task force that investigated and arrested the conspirators].
 
 
 14
 ....
 
 
 15
 MS. MARX: Objection, Your Honor. You just told the jury that you're the one that decides.
 
 
 16
 COURT: Mr. Sochor doesn't have anything to do with it, ladies and gentlemen.
 
 
 17
 MR. ARNOLD: Your Honor, what I'm getting at--
 
 
 18
 COURT: But you asked him if Mr. Sochor is the man who's going to reduce his sentence, and he's, I'm sure, not up in the ways of the judiciary and it's not Mr. Sochor, I can tell you.
 
 
 19
 MR. ARNOLD: Your Honor, I understand that and we all understand that, but it's his mental state if he--
 
 
 20
 COURT: Go ahead. The jury has heard. Ask him something, the next question.
 
 
 21
 MR. ARNOLD: No further questions.
 
 
 22
 JA 136-38 (emphasis added). Relying on Giglio v. United States, 405 U.S. 150 (1972), and our decision in Boone v. Paderick, 541 F.2d 447 (4th Cir.1976), cert. denied, 430 U.S. 959 (1977), Maxwell argues that this exchange denied Maxwell his due process right to reveal to the jury the prosecutor's concealment of promises of favorable treatment in exchange for a witness's testimony. We disagree.
 
 
 23
 We are of opinion that this case is not controlled by Giglio or Boone, both of which centered on the prosecutors' knowledge of or deliberate concealment of the falsity of a witness's testimony that there were no promises made to the witness by governmental agents. In Boone, 541 F.2d at 450, we stated that:
 
 
 24
 Whether Giglio applies depends upon whether the jury may have been falsely led to believe that [the witness] was motivated solely by conscience and altruism and that there was no deal when in truth he responded to [the prosecutor's] promises.... [T]he prosecutor made statements which were clearly intended to give the impression that [the witness] knew nothing about possible lenient treatment, that he testified against, rather than in aid of, his penal interest, and that his testimony in general was the product of an active conscience.
 
 
 25
 We hold that [the witness'] general denial of any promise of leniency, when coupled with the prosecutor's emphasis upon altruistic motivation, constitutes false evidence of which the prosecutor knew or should have known.
 
 
 26
 The instant case is dissimilar from this line of cases in a number of respects: First, Maxwell has presented no evidence suggesting that McDermott or any other witness was promised or induced by anything more than what was in the witness's plea agreement. Second, the jury was told about promises made to McDermott and the other adverse witnesses. Third, the prosecution made no effort to put forth, or to conceal the falsity of, any false statement regarding promises or inducements.
 
 
 27
 Moreover, we do not believe after reviewing the record that Maxwell was denied the opportunity to cross-examine McDermott regarding his subjective understanding of the substantial-assistance mechanism. Maxwell's counsel asked two questions of McDermott, both of which were improperly phrased. He first asked whether to McDermott's knowledge, more help meant more assistance. McDermott was not qualified to give the knowledgeable response for which this query explicitly asked, as the prosecution and the district court properly noted. Far from being an abuse of discretion, the district court's admonition that the question's substance was inaccurate was necessary to cure the confusion or misconception that the question might have raised in the minds of the jury. Maxwell's counsel then asked, without elaboration or qualification, who would decide whether McDermott would get a reduced sentence. Again, this question called for knowledge or expertise on the part of the witness. Moreover, it did so with regard to a fact that the district court had moments earlier explained to the jury in order to cure the confusion created by the first question.
 
 
 28
 Mr. Arnold apparently intended to ask how, in McDermott's understanding, the substantial-assistance procedure worked. To avoid the confusion between fact, which the jury was entitled to know, and McDermott's subjective belief, which the jury might have found relevant, the district court was well within its discretion to require Arnold to ask these questions in accurate terms. The district court, in deciding both questions, told the jury no more or less than that the facts were not as Mr. Arnold was relating them. The record shows that Maxwell was not prohibited from pursuing questions on the subject of McDermott's understanding of those facts.[2] We are therefore of opinion that the district court did not abuse its discretion in sustaining objections as to both questions. It follows that Maxwell was not denied due process.
 
 II.
 A.
 
 29
 Maxwell cites several of this court's opinions in support of his contention that the government did not establish beyond a reasonable doubt all of the elements of the crime of conspiracy to possess with intent to distribute and to distribute cocaine and cocaine base under 21 U.S.C. Sec. 846.[3]
 
 
 30
 However, Maxwell does not take account of United States v. Brooks, 957 F.2d 1138, 1147 (4th Cir.), cert. denied, 60 U.S.L.W. 3879 (U.S. June 29, 1992), in which we held that "[o]nce it has been shown that a conspiracy exists, the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction." Having reviewed the record, we are convinced that the evidence supports a connection between Maxwell and the conspiracy, which is more than slight. The evidence shows, in addition to a number of purchases and sales of crack cocaine by Maxwell, that Maxwell assisted Miller in cooking and weighing crack cocaine, that he accompanied Miller on crack-purchasing trips, that he took cocaine and crack from Miller and from Miller's secret hiding places on Miller's authority and later replaced it with proceeds from the sales of the drugs, that his function was to see "that the money was collected" from the sale of drugs by the Miller conspiracy, and that he accompanied Miller and others on a robbery at least one purpose of which was to steal drugs. Moreover, Maxwell lived with Miller and other co-conspirators at several locations throughout the Eastern District of Virginia, and he falsified his driver's license and other identification. We think it evident that there is substantial evidence that Maxwell had more than a slight connection with the Miller conspiracy,[4] and we so hold.
 
 B.
 
 31
 Maxwell next argues that the evidence did not support his conviction for possession with intent to distribute the approximately one-half kilogram of cocaine stolen from Matthews on June 8, 1991, because there was no evidence that Maxwell had actual or constructive possession of the cocaine on that date. We disagree. The evidence shows that Matthews told the robbers, including Maxwell, that the cocaine was in his car after inquiry from Miller, who was beating Matthews, and Maxwell, who was holding a machine gun on Matthews. McDermott then went out to the car and returned to the apartment. Even if we agree with Maxwell that the government did not present evidence that Maxwell actually saw the cocaine McDermott retrieved from Matthews' car, we do not believe that this was necessary to establish constructive possession.
 
 
 32
 Constructive possession exists when the defendant knows of an object and exercises, or has the power to exercise, dominion and control over that object. United States v. Bell, 954 F.2d 232, 235 (4th Cir.1992). We think it evident that Maxwell knew of the existence of the cocaine in Matthews' car, because Matthews told him it was there, and that, if nothing else, the machine gun in Maxwell's hands clearly establishes Maxwell's ability to exercise dominion over the cocaine. Moreover, we have held that, " 'possession of a large amount of [drugs] among several people working together may be sufficient to show that each had constructive possession.' " United States v. Nelson, 6 F.3d 1049, 1053 (4th Cir.1993) (quotation omitted), cert. denied, 62 U.S.L.W. 3792 (U.S. May 31, 1994). Finally, we have held that the imputation of knowledge to a defendant for purposes of establishing possession should be analyzed under the totality of the circumstances surrounding the incident in question, and may be established by circumstantial evidence. See Bell, 954 F.2d at 235. We think it evident that, in the light most favorable to the government, there was substantial evidence that, under the circumstances surrounding the June 8 robbery, Maxwell had possession of the cocaine found in Matthews' car. We accordingly affirm Maxwell's conviction on Count Thirty-Three.[5]
 
 C.
 
 33
 Maxwell's final argument is that the evidence does not support his conviction under Count Thirty-Seven for possession of a firearm by a convicted felon under 18 U.S.C. Sec. 922(g)(1), because the government did not establish that the weapon held by Maxwell during the robbery on June 8, 1991, traveled in interstate commerce as required by Section 922(g)(1). Two of Maxwell's accomplices in the robbery and one of the robbery victims testified that Maxwell held an Uzi, an Israeli-made machine gun which would have to have travelled in interstate commerce in order to come into his possession.[6] Maxwell argues, however, that the witnesses did not and could not verify that the weapon was actually an Uzi, since the weapon was never recovered, and that several Virginia gun manufacturers make automatic weapons similar to the Israeli-made Uzi. If Maxwell had come into possession in Virginia of a Virginia-made weapon bought in Virginia, he argues, the weapon might never have travelled in interstate commerce. Further, he argues, on the streets the word "Uzi" means any automatic machine gun, and thus the witnesses themselves did not necessarily intend to denote the weapon manufactured in Israel when they referred to Maxwell's gun as an Uzi.
 
 
 34
 The record reveals that Maxwell did not cross-examine any of the government's witnesses as to what they meant by "Uzi." He did not introduce any evidence with respect to any weapons manufactured in Virginia that resemble an Uzi machine gun. He did not produce any evidence that Clinton Matthews, who owned the weapon possessed by Maxwell, had bought a Virginia-made machine gun or had never bought an Israeli-made Uzi. In fact, Wheatley, who testified that he was with Matthews when the weapon was purchased, said he saw Matthews buy an Uzi. One expert witness testified, in response to a direct question by the district court, that an Uzi manufactured in Israel and found in Virginia would have to have come across state lines, because most Uzis are imported into the United States by a company in Pennsylvania. Maxwell did not object to this testimony or attempt to counter it either on cross-examination or by contrary evidence, and there is no evidence that anything prohibited him from doing so.
 
 
 35
 There is simply no evidence in the record to counteract the government's proof that the weapon Maxwell possessed was an Israeli-made Uzi which traveled in interstate commerce, and we thus find Maxwell's argument on appeal unavailing in the instant case. Based on the evidence before the jury at trial viewed in the light most favorable to the government, we find that there was sufficient evidence to support the jury's conclusion that the weapon was an Israeli-made Uzi that traveled in interstate commerce. We accordingly affirm Maxwell's conviction on Count Thirty-Seven.
 
 Maxwell's convictions are accordingly
 
 36
 AFFIRMED.
 
 
 
 [1]
 The indictment named six individuals. Maxwell was named in six of the forty counts, and the district court dismissed two of the six counts against Maxwell prior to his trial. One indicted co-conspirator, Chad Evans, was tried and convicted prior to Maxwell's trial. Another had not been apprehended at the time of trial. A third was found to have been a juvenile and the indictment against him was dismissed. The remaining two co-conspirators, Miller and Miss Ware, negotiated plea agreements with the government in exchange for their testimony at Evans' and Maxwell's trials
 
 
 [2]
 In cross-examining an unindicted co-conspirator named Urel Mattis, Maxwell's counsel, after having established that Mattis had not been promised anything by federal authorities, asked of Mattis: "In your mind, Mr. Mattis, are you avoiding federal charges by testifying here today? I didn't ask you if you were promised. I said in your mind are you avoiding those charges?" JA 36 (emphasis added). The government did not object, and the witness responded negatively. In cross-examining Maxwell's indicted co-conspirator, Miss Ware, Maxwell's counsel asked the witness, "Could you tell the Court and the members of the jury what a motion for substantial assistance is, in your own words." The government objected on the ground that the question called for an expert legal response, but the district court allowed the line of questioning. Maxwell's counsel then asked, "To your knowledge, who decides whether you get the sentence reduction?" Miss Ware answered that she was not sure. JA 251-52 (emphasis added)
 We are of opinion that the distinction between these permitted questions and those asked of McDermott is that the questions asked of McDermott were phrased in such a manner that the jury might have been misled into believing McDermott was testifying as to the truth of the matters asserted, of which he had no knowledge, rather than his own subjective beliefs. The fact that the district court permitted similar questions to be asked of other witnesses illustrates what the plain meaning of his rulings regarding the McDermott questions suggests; namely, that the district court was properly concerned with the form of the questions.
 
 
 [3]
 "The essential elements of a Sec. 846 conspiracy are (1) an agreement between two or more persons to undertake conduct that would violate the laws of the United States relating to controlled substances and (2) the defendant's wilful joinder in that agreement." United States v. Clark, 928 F.2d 639, 642 (4th Cir.1991). Maxwell does not dispute the existence of a conspiracy, see Blue Brf. 12, but argues that the government did not show that he was a willful participant therein
 
 
 [4]
 Maxwell also cites to our decision in United States v. Giunta, 925 F.2d 758, 767 (4th Cir.1991), wherein we held that, "proof that an alleged conspirator ... has assisted a willing (ostensible) buyer ... in finding an ostensibly willing seller of drugs ... would not, standing alone, establish any agreement between the facilitator and the seller to do anything in concert with the drugs," and that, "if the purposes of the alleged coconspirators are different, though both are aimed at unlawful goals, there is no conspiracy." Blue Brf. at 17, citing Giunta, 925 F.2d at 764. There is simply no evidence in this case that Maxwell was a mere facilitator, or that his goals were different from those of the other conspirators. "Assuming that the witnesses could be believed," Blue Brf. at 17, as we must, the evidence amply supports the conclusion that Maxwell knowingly and willfully distributed cocaine for the Miller conspiracy on an ongoing basis, assisted in concealing the conspiracy from law enforcement and others, and routinely shared in the profits of the conspiracy. Giunta is thus inapposite to the instant case
 
 
 [5]
 As Maxwell essentially recognizes, if he was properly convicted under Count Thirty-Three, then he was properly convicted under Count Thirty-Five of possession of a firearm while in possession of a controlled substance. We accordingly affirm that conviction as well
 
 
 [6]
 Maxwell argues on appeal that the machine gun, assuming it was an Israeli-made Uzi, might not in any event have travelled in interstate commerce, because possession of a weapon which travelled in interstate commerce is distinguished in section 922(g) from possession of one which travelled in foreign commerce, with which Maxwell was not charged. Maxwell now argues that "it is very likely and highly probable given the port activity in Norfolk, Virginia, that the Uzi in question was imported directly into Virginia ... and never crossed state lines."
 We note that the government's expert testified that an Israeli-made Uzi would have to have crossed state lines, and this evidence was uncontroverted. In any event, assuming Maxwell's argument is correct, several courts have considered and rejected challenges to indictments charging possession of a weapon which has been shipped or transported in interstate commerce where the evidence proves that the weapon was shipped or transported only in foreign commerce. See United States v. Alvarez, 972 F.2d 1000, 1003 (9th Cir.1992) (holding that possession by a convicted felon of a weapon manufactured in Spain and shipped directly into California satisfies 922(g) even where the indictment charged only possession of a weapon " 'in and affecting interstate commerce,' " because "the term 'interstate or foreign commerce' is a unitary one" and because Congress intended Section 922(g) to be read broadly to require " 'no more than a minimal nexus requirement.' ") (quotations omitted); United States v. Young, 730 F.2d 221, 224-25 (5th Cir.1984) (reaching the same conclusion with respect to a weapon that might have been shipped directly from France into Texas, concluding that proof of a foreign-commerce nexus where the indictment alleged interstate-commerce nexus was merely a harmless variance). We thus reject Maxwell's challenge.