33 F.3d 53
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Fayaz ANJUM, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Noor AHMAD, Defendant-Appellant.
 Nos. 93-5537, 93-5538.
 United States Court of Appeals, Fourth Circuit.
 Argued: June 10, 1994.
Decided: August 10, 1994.
 
 Appeals from the United States District Court for the District of Maryland, at Baltimore. Herbert N. Maletz, Senior Judge, sitting by designation. (CR-92-96)
 David Warren Lease, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, Maryland, for Appellant Anjum;
 Isaac Joe, Jr., Baltimore, Maryland, for Appellant Ahmad.
 Katherine Jacobs Armentrout, Office of the United States Attorney, Baltimore, Maryland, for Appellee.
 Lawrence S. Greenwald, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, Maryland, for Appellant Anjum.
 Lynne A. Battaglia, United States Attorney, Jan Paul Miller, Assistant United States Attorney, Baltimore, Maryland, for Appellee.
 D.Md.
 AFFIRMED.
 Before WILKINSON and NIEMEYER, Circuit Judges, and WILLIAMS, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Appellants in this case challenge their convictions for conspiracy to import and distribute heroin in violation of 21 U.S.C. Secs. 846 and 963. Appellants' primary contention is that the government failed to present sufficient evidence to support the jury's findings of guilt. Because the jury's verdicts were supported by substantial evidence, however, we reject appellants' claims and affirm their convictions.
 
 I.
 
 2
 During his incarceration in a federal prison facility, inmate Afsar Khan met fellow inmate Khalid Khan. Their conversations in prison led Afsar Khan to believe that Khalid Khan was involved in ongoing heroin importation. In July 1991, after his release from prison, Afsar Khan notified Special Agent Dennis Bass of the U.S. Customs Service of his suspicions. SA Bass instructed Afsar Khan to contact Khalid Khan, who by then had been released from jail and was residing in Peshawar, Pakistan. Although Khalid Khan initially denied any involvement in the drug business, he later telephoned Afsar Khan to discuss a proposed drug transaction.
 
 
 3
 On August 22, 1991, Khalid Khan informed Afsar Khan that approximately 1.235 kilograms of heroin had been imported into the United States, and that the first kilogram of this amount would sell for $100,000. Khalid Khan instructed Afsar Khan to contact Khalid Khan's courier and to pay him $15,000 upon receiving the heroin. Afsar Khan was to pay the remaining $85,000 to Khawaja Arshad in New York, to whom he was to identify himself as "Mr. Durrani's man; care of Tariq Saraf Peshawar." On August 26, 1991, Afsar Khan and SA Bass, acting in an undercover capacity, met with two couriers in Baltimore. The couriers delivered more than a kilogram of heroin,[1] and informed SA Bass that they had personally imported it from Pakistan. SA Bass then delivered the $15,000 to the couriers.
 
 
 4
 Following that meeting, Afsar Khan and SA Bass contacted Khawaja Arshad to arrange for payment of the remaining $85,000. Arshad, however, refused to come to Baltimore to pick up the money. On September 4, 1991, Afsar Khan received a telephone message from appellant Fayaz Anjum, who subsequently stated that he was in Los Angeles and would travel to Baltimore to pick up the $85,000 for Khalid Khan. Anjum requested that payment be made in "big bills." Afsar Khan later telephoned Anjum and stated that he would await Khalid Khan's instructions. Afsar Khan also stated that the money was "drug money." When Afsar Khan called Khalid Khan in Pakistan, Khalid Khan instructed him to pay the money to Anjum. Khalid Khan assured Afsar Khan that individuals working with him in Pakistan knew Anjum.
 
 
 5
 On September 5, 1991, Anjum travelled to Baltimore and met with Afsar Khan. Afsar Khan delivered the $85,000 to Anjum, who counted the money and complained that it was not in large bills. Anjum wrote out and signed a receipt for Afsar Khan. As part of a pre-arranged ruse, however, a Baltimore police officer drove up to the scene and asked for permission to search the car. Afsar Khan granted the permission, the money was discovered, and both men denied any knowledge of the money. Police confiscated the $85,000 after dogs detected the presence of drugs on the bills, but neither man was arrested. After the police left, Afsar Khan returned the receipt to Anjum.
 
 
 6
 In the days after this incident, Khalid Khan, suspicious about the confiscation of the funds, again contacted Afsar Khan and asserted that Afsar Khan still owed him $85,000. Khalid Khan directed Afsar Khan to contact Anjum so they could arrange to recover the money from the police. When Afsar Khan called Anjum, Anjum stated that he had spoken with people in Pakistan and that they must go to the police to seek a return of the money. Afsar Khan, however, refused to do so. In the following months, conversations between the numerous participants continued. During this time, SA Bass received a sample of heroin from Pakistan in an envelope marked "Tariq Ahmad," bearing a return address of Peshawar, Pakistan. In November 1991, Anjum stated to Afsar Khan that his contact in Pakistan was a man named Tariq, Khalid Khan's neighbor.
 
 
 7
 In January 1992, the dispute over the $85,000 appeared to reach a resolution, as SA Bass agreed to pay $40,000 to Khawaja Arshad in New York. Khalid Khan explained to SA Bass that one of his partners, Taviz Khan, had approved of the transaction. After Afsar Khan and SA Bass travelled to New York, however, Arshad refused to accept any drug money.
 
 
 8
 In March 1992, SA Bass and Afsar Khan were contacted by two individuals, Taviz Khan and Ghulam Mohammad, and told to deliver the $40,000 to someone in Baltimore who would identify himself as "Shahji Tiger." Shahji Tiger turned out to be appellant Noor Ahmad. On March 13, 1992, Afsar Khan spoke with Ahmad, who stated that he was coming to Baltimore and that Afsar Khan should bring "big bills." On March 17, Afsar Khan and SA Bass met with Ahmad and his bodyguard, Javid Hanif, in Baltimore. SA Bass drove them to an undercover location where they spoke for three and a half hours. During that meeting, SA Bass told Ahmad and Hanif about receipt of the heroin in Baltimore in August 1991, and about the loss of the $85,000 in September. Ahmad told SA Bass that additional shipments of heroin would be arriving, and described to SA Bass how large amounts of heroin could be imported into the United States. Ahmad further stated that his contact in the organization was Ghulam Mohammad. At the end of the meeting, SA Bass refused to deliver any money to Ahmad, stating that he would instead travel to Pakistan to meet with the organization's principals. Approximately two months later, Ahmad called SA Bass and indicated that he was interested in returning to Pakistan and working for SA Bass from there. Later that same day, Ahmad left SA Bass a message that he did not trust Bass and would no longer deal with him.
 
 
 9
 On March 11, 1992, a federal grand jury indicted Fayaz Anjum along with several other members of the conspiracy. Count I charged Anjum with conspiracy to import heroin into the United States, see 21 U.S.C. Sec. 963, and Count II charged him with conspiracy to distribute and possess with intent to distribute heroin, see 21 U.S.C. Sec. 846. On August 12, 1992, a grand jury returned a superseding indictment, which added Noor Ahmad as one of the defendants listed in Counts I and II. A jury trial commenced on April 12, 1993, and on April 21, the jury returned verdicts of guilty for both defendants on Counts I and II. Anjum received concurrent sentences of 124 months imprisonment on each count. Ahmad was sentenced to 130 months imprisonment on each count, also to run concurrently. Both defendants were ordered to pay a special assessment of $100. Anjum and Ahmad now appeal.
 
 II.
 
 10
 Fayaz Anjum contends that the district court erred in denying his FED. R. CRIM. P. 29 motion for a judgment of acquittal. Anjum maintains that the government presented insufficient evidence to support a jury finding that he was guilty. In particular, he argues that there was insufficient evidence to show that he knew the objectives of the conspiracy and that he agreed to cooperate in achieving those objectives. Given the evidence presented at trial, however, we find no merit in Anjum's claim.
 
 
 11
 We note at the outset that our review of a jury's finding of guilt is carefully circumscribed. Such a verdict "must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942); see also United States v. Blue, 957 F.2d 106, 107 (4th Cir.1992). Accordingly, if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," Jackson v. Virginia, 443 U.S. 307, 319 (1979), we will not disturb the jury's verdict. Keeping this standard of review in mind, we turn to the evidence.
 
 
 12
 To establish a defendant's participation in an illegal drug conspiracy, the government must show "(1) an agreement between two or more persons to undertake conduct that would violate the laws of the United States relating to controlled substances and (2) the defendant's wilful joinder in that agreement." United States v. Clark, 928 F.2d 639, 641-42 (4th Cir.1991); see also United States v. Giunta, 925 F.2d 758, 764 (4th Cir.1991). The government may use circumstantial evidence to demonstrate a defendant's participation in a conspiracy and his knowledge of the conspiracy's objectives. See Glasser, 315 U.S. at 80; Giunta, 925 F.2d at 764. Furthermore, the government need not prove that a defendant was aware of all of the conspiracy's details. Rather, if the defendant " 'joins the conspiracy with an understanding of the unlawful nature thereof and willfully joins in the plan on one occasion, it is sufficient to convict him of conspiracy.' " United States v. Bell, 954 F.2d 232, 236 (4th Cir.1992) (quoting United States v. Roberts, 881 F.2d 95, 101 (4th Cir.1989)).
 
 
 13
 In this case, the government presented the jury with ample evidence of an agreement to import and distribute heroin and Anjum's knowing participation in that agreement. In Afsar Khan's first contact with Anjum, Anjum identified himself as "a friend of Khalid" and arranged to pick up $85,000 in "big bills" from Afsar Khan. During another telephone contact later that day, Afsar Khan stated to Anjum that the $85,000 was "drug money." Far from objecting, Anjum responded with a simple "okay."[2] Similarly, despite Anjum's present claim that he had no contact with Khalid Khan, Khalid Khan assured Afsar Khan that it was safe to pay Anjum. Khalid Khan explained that "[h]is name is Fayaz. Give the money to him. He will bring it direct to Pakistan."
 
 
 14
 When Afsar Khan and Anjum finally met in Baltimore, Anjum's behavior continued to indicate participation in the conspiracy. Anjum carefully counted the $85,000 presented to him and complained that it was in small bills. Similarly, events after that meeting tied Anjum to the principals in Pakistan. Khalid Khan told Afsar Khan that his partners had been in contact with Anjum after the $85,000 was confiscated by the police, and Anjum stated to Afsar Khan that he had made calls to the Pakistani conspirators. Anjum explained to Afsar Khan that they should attempt to recover the $85,000 from the police by constructing a story as to the money's origin. In recommending this course of action, Anjum indicated that he was receiving instructions from individuals in Pakistan.[3]
 
 
 15
 Rather than suggesting a mere association with the principals in Pakistan, the government's evidence provides substantial support for the finding that Anjum played an important role in the conspiracy and that he was aware of the conspiracy's goals of importing and distributing heroin. Anjum was specifically informed that the $85,000 was drug money, yet continued in his efforts to collect that money from Afsar Khan and, after the money was confiscated, from the police. Anjum was in direct contact with individuals in Pakistan who arranged for the shipment of heroin to the United States. Similarly, the conspiracy's principals indicated that Anjum could be trusted to receive the money and to deliver it to them in Pakistan. This evidence is certainly sufficient to support the jury's finding that Anjum was a knowing player in the conspiracy. Accordingly, we have little trouble affirming the district court's denial of Anjum's Rule 29 motion.
 
 III.
 
 16
 Noor Ahmad raises several challenges to his convictions and the resulting sentence. Ahmad's first claim is that the district court erred in denying his Rule 29 motion for acquittal on Count I--conspiracy to import heroin--because the government failed to prove that he was involved in an importation conspiracy. Ahmad argues that, unlike the one conspiracy alleged in the indictment, the government actually proved the existence of several conspiracies. In particular, he claims that his attempt to obtain $40,000 from SA Bass in March 1992 was part of a separate conspiracy from the original drug importation in August 1991. Ahmad maintains that the indictment's failure to account for the existence of several conspiracies should invalidate his conviction on Count I.
 
 
 17
 We are not persuaded. The fact that Ahmad did not surface as a participant in the conspiracy until March 1992 does not mean that he cannot be held accountable for involvement in a conspiracy stretching back to August 1991 or even earlier. "A coconspirator is bound by the overt acts of other coconspirators furthering the conspiracy both before and after being enlisted even though he may not participate in each overt act." United States v. Spudic, 795 F.2d 1334, 1337 (7th Cir.1986). The mere fact that Ahmad first attempted to collect money for the August 1991 heroin sale in March 1992 does not relieve him of liability as a member of the heroin importation conspiracy.
 
 
 18
 Similarly, Ahmad's contention that the government proved several conspiracies, rather than a single one, is without merit. Ahmad contends that the August 1991 drug transaction was completed by the time he entered the conspiracy. However, the government presented evidence showing that Ahmad's role was to collect $40,000 as payment for the drugs delivered to SA Bass in August 1991. Accordingly, the jury could find that Ahmad played an important role in the August transaction itself. Furthermore, even if Ahmad were correct in asserting that the $40,000 payment were "good faith" money for future drug sales, that does not preclude his being a member of an ongoing drug importation conspiracy. Conspiracies need not consist of a single, isolated drug transaction. Rather, where there is an "overlap of key actors, methods, and goals" over time, a single conspiracy can be made up of repeated transactions. United States v. Leavis, 853
 
 
 19
 F.2d 215, 218 (4th Cir.1988). Here, the key actors (Khalid Khan and his colleagues in Pakistan), the methods (importation of drugs from Pakistan to the United States and utilization of couriers within the United States), and the goals (the importation and distribution of heroin) all remained constant, and thus there was more than sufficient evidence to support the finding of a single conspiracy. The question of whether there was a single conspiracy was properly left to the jury, see Leavis, 853 F.2d at 218; United States v. Tarantino, 846 F.2d 1384, 1391 (D.C.Cir.1988), and we will not disturb its conclusion.
 
 
 20
 Ahmad also challenges his conviction on Count II, claiming that the government failed to present sufficient evidence to convict him for conspiracy to distribute heroin. Viewing the evidence in the light most favorable to the government, see Glasser, 315 U.S. at 80, however, there is little question that the jury was presented with evidence sufficient to find Ahmad guilty.
 
 
 21
 On March 17, 1992, Ahmad travelled to Baltimore and met with SA Bass and Afsar Khan for three and a half hours. During that meeting, the participants discussed illegal drug transactions at length, and they collectively telephoned several of the conspiracy's principals in Pakistan. Ahmad even explained to SA Bass techniques that could be used to import large amounts of heroin into the United States, and identified his contact in Pakistan as Ghulam Mohammad. Two months after that meeting, Ahmad again contacted SA Bass and indicated his willingness to return to Pakistan and supply SA Bass with drugs from that country.
 
 
 22
 Ahmad's arguments at trial, i.e., that he could not understand English well and that the entire meeting with SA Bass was playacting motivated by his fear of drug dealers, cannot save him on appeal. The jury was fairly presented with those explanations and chose to reject them. That the jury chose to do so is not surprising; after all, Ahmad did manage to engage in a prolonged conversation concerning illegal drug transactions with SA Bass and Afsar Khan, and he did explain to them how drugs could be imported into the United States. It is hard to believe that his conduct was actually "fashioned ... after information and roles he had viewed on television and from watching movies," as Ahmad now claims. Because the evidence at trial was sufficient to show the existence of a conspiracy and Ahmad's knowing participation in that conspiracy, Ahmad is not entitled to relief from his conviction on Count II.
 
 
 23
 Finally, Ahmad challenges the district court's decision not to grant him a downward adjustment from his base offense level at sentencing. Ahmad claims that he was entitled to a two-level reduction under Sec. 3B1.2 of the Sentencing Guidelines, which provides for such a decrease when the defendant is a "minor participant" in the criminal activity. Ahmad argues that he was a one-time recruit sent to collect money for Khalid Khan, and that there is no evidence he acted in anything other than a minor role.
 
 
 24
 The district court's decision concerning Ahmad's role in the offense is reviewed under the clearly erroneous standard. See United States v. Gordon, 895 F.2d 932, 934 (4th Cir.1990); United States v. Daughtrey, 874 F.2d 213, 218 (4th Cir.1989). In determining whether Ahmad was entitled to a mitigating adjustment, the court was required to place the burden on Ahmad to prove, by a preponderance of the evidence, that his actions merited such a reduction. See Gordon, 895 F.2d at 935. Here, we cannot say that the district court clearly erred in determining that Ahmad failed to carry this burden. The district court noted at sentencing that Ahmad brought a bodyguard with him to the March 17 meeting and that Ahmad explained to SA Bass how large quantities of heroin could be imported into the United States. The court further noted Ahmad's May 8, 1992, phone conversation with SA Bass during which Ahmad expressed his willingness to return to Pakistan and help SA Bass import heroin into the United States. Based on this conduct, the court determined that a downward adjustment would not be warranted. Its decision is well grounded in the evidence, and we refuse to disturb it.
 
 IV.
 
 25
 For the foregoing reasons, the judgment of the district court is
 
 
 26
 AFFIRMED.
 
 
 
 [1]
 Although the total payment amounted to only $100,000, while the amount delivered exceeded one kilogram, the record does not indicate any further discussion concerning additional amounts to be paid for the excess heroin
 
 
 [2]
 Anjum claims that this reference to "drug money" should be discounted because the word "drug" was spoken in English, and he has difficulty understanding the English language. This is exactly the type of argument which is properly considered by a jury, and we will not now question the jury's reliance on any such statement
 
 
 [3]
 In addition to this evidence of Anjum's participation in the conspiracy, Anjum stated to Afsar Khan that his contact in Pakistan was Khalid Khan's neighbor, Tariq. On October 21, 1991, SA Bass received a sample of heroin from Peshawar, Pakistan in an envelope marked "Tariq Ahmad."