UNITED STATES of America,
Plaintiff–Appellee,

v.

George Richard MORROW, Jr., a/k/a
Richard Morrow,
Defendant–Appellant.

No. 90–6013.

United States Court of Appeals,
Fourth Circuit.

Argued July 17, 1990.

Decided Sept. 24, 1990.

James Elliot Ferguson, II, Anita S. Hodgkiss, on brief, Ferguson, Stein, Watt, Wallas, Adkins & Gresham, Charlotte, N.C., for defendant-appellant.

Max Oliver Cogburn, Jr., Asst. U.S. Atty., Thomas J. Ashcraft, U.S. Atty., on brief, Asheville, N.C., for plaintiff-appellee.

Before ERVIN, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

George Richard Morrow, Jr. was accused of violating the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(a) & (d), by participating in a conspiracy to manufacture, possess, and distribute methamphetamine and then to invest the proceeds of the operation in real estate acquisitions. On February 2, 1987, Morrow entered a guilty plea pursuant to *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), pleading guilty though maintaining his innocence. Morrow pled guilty to Count I of a forty-three count indictment in return for the government's agreement to dismiss the remaining counts. The district court sentenced Morrow to a term of twelve years in prison and fined him $10,000. Thereafter, Morrow filed an ultimately unsuccessful motion under Fed.R.Crim.P. 35 for a reduction of his sentence. On August 3, 1988, Morrow filed a motion pursuant to 28 U.S.C. § 2255 to vacate his sentence. United States District Court Judge Robert Potter affirmed the magistrate's denial of Morrow's motion and accepted the magistrate's memorandum and recommendation in its entirety. Morrow has appealed charging that there were insufficient facts before the district court from which it could find a factual basis for entering judgment on his guilty plea. Morrow further charges that, because the government did not inform the court that his plea was linked to that of another codefendant in the conspiracy, his father, George Richard Morrow, Sr., the trial court could not make a proper inquiry into the voluntariness of his plea.

I.

At the same Rule 11 proceeding at which Morrow pled guilty, codefendants George Richard Morrow, Sr. (hereinafter Morrow, Sr.), John Ernest Dean, and Harold Hugh Dean also entered guilty pleas. Both the Morrows maintained their innocence despite their pleas.

At the hearing Dallas McKnight, a special agent with the Internal Revenue Service (IRS), testified that his investigation had revealed the existence of nine methamphetamine laboratories operating in both North and South Carolina between 1979 and 1984. During the course of the investigation, McKnight interviewed at least six of the people who worked in the labs. McKnight testified that "almost all" of the people interviewed reported that the operation involved three parts: manufacture of the drug, distribution of the drug, and laundering of the proceeds. The people McKnight interviewed identified the Deans as being in charge of the manufacturing end of the operation and the Morrows as being the money launderers.[1] Another special agent with the Criminal Investigation Division of the IRS, James E. Stephens, Jr., testified that only one of the witnesses interviewed, Billy Ray Thackston, outlined

---

[1] Another named defendant, Sonny Cole, was the alleged distributor. Cole did not plead guilty, but went to trial and was acquitted.

what interests each member of the conspiracy had in the money from the operation.[2]

During the course of the conspiracy, the labs produced approximately 300 pounds of methamphetamine. Government investigators traced almost a million dollars in drug proceeds to Morrow, which Morrow had invested. Morrow has admitted that he invested the proceeds, but has denied knowing that the money was from the distribution of drugs.

Using the legal services and offices of Morrow, Sr., a lawyer, Morrow, Jr. set up more than twelve dummy corporations to hold some of the assets. The names listed on the state forms as the incorporators of those organizations included George R. Morrow, Sr.'s secretaries, Richard Morrow's girlfriend Karen Storm, who was also the niece of John and Harold Dean, and Sonny Cole, the alleged distributor. Listed as directors of the corporations, in addition to Richard Morrow and Sonny Cole, were employees and employees' relatives of George Morrow, Sr.

The corporations purchased real estate for investment purposes. Several of the investment properties were used as methamphetamine lab sites. When questioned by government investigators about a 95-acre site her corporation, Upfront Corporation, had bought, Karen Storm stated that, prior to her appearance before the grand jury investigating the conspiracy, Morrow instructed her to lie,[3] and to state that she had bought the property for investment purposes. Another witness and worker at one of the lab sites, Larry Doyle Campbell, testified that the 95-acre site was to be a permanent, underground, bunker-type drug laboratory.

The trial court questioned each defendant individually as to the voluntariness of his plea, as well as his understanding of the nature of the charges against him. The court found that all defendants had entered their pleas voluntarily with the understanding of the nature of the charges and the consequences of their pleas. Although the court was not so advised, the Morrows' pleas were linked together. Morrow, Jr.'s guilty plea to only one of 43 counts would not be accepted by the government unless his father also pleaded guilty.[4]

Morrow, Jr. signed a "Stipulation of Factual Basis" which stated that:

The parties hereto agree that the following shall constitute a factual basis for the plea of guilty of the Defendant Richard Morrow to Count I in the Bill of Indictment:

It is stipulated that the Government's evidence would tend to show that Richard Morrow invested money derived from proceeds of a methamphetamine operation in land acquisitions. However, the evidence will show that Richard Morrow at no time manufactured or sold methamphetamine and was never in the presence of a methamphetamine laboratory. The Governments [sic] evidence will further tend to show that the enterprise had substantial income, but the Government has no knowledge as to whom this income should be attributed.

Morrow acknowledges that the primary purpose of the stipulation was to protect

---

2. Thackston provided the government with information under a grant of immunity. His testimony before the grand jury regarding Morrow's role was that there were other "partners that, you know, wasn't in the lab with us, supposedly Sonny Cole and Richard Morrow." Though Thackston never actually talked with Richard Morrow, Jr., Thackston, according to his testimony, did see him three or four times at a lab site, but not actually in a building where a lab was located.

3. Storm told investigators that, prior to the time a lab located on land held by one of her corporations was raided by government agents, she had no knowledge of the corporations or any of

the property that she ostensibly owned. She also told investigators that Richard Morrow brought various documents to her and had her sign them, but she had no knowledge whatever of the corporations. After the lab site was raided, Morrow brought her a lot of documents to sign involving "transferring the property to sell and things of that nature." Storm was not indicted in the conspiracy.

4. Morrow, Sr. pled guilty to one count of tax conspiracy in return for dismissal of the remaining counts against him and the government's agreement to dismiss all counts against his legal secretary.

him at the sentencing stage of the proceeding by getting the government on record that Morrow did not participate in the manufacturing and distribution activities of the enterprise. The stipulation, however, establishes that he did invest the proceeds.

## II.

■ As noted above, Morrow pleaded guilty pursuant to *North Carolina v. Alford, supra.* In *Alford,* the Supreme Court held that a defendant "may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." 400 U.S. at 37, 91 S.Ct. at 167. Acceptance of such pleas is within the discretion of the trial judge. *Id.* at 38, n. 11, 91 S.Ct. at 168, n. 11. Because an *Alford* plea is a variation of a guilty plea, a court accepting such a plea must comply with the basic requirements outlined in Fed.R. Crim.P. 11. At issue here is the amount of evidence necessary to establish the factual basis for the plea pursuant to Fed.R. Crim.P. 11(f). Morrow charges error in the trial court's acceptance of his plea, alleging the strong factual basis for the plea was lacking.

The trial court has wide discretion in determining whether a factual basis exists. *See United States v. Lumpkins,* 845 F.2d 1444, 1451 (7th Cir.1988) (it was within the judge's discretion to determine whether letters were written by the defendant within the statute of limitations period and could form the factual basis of an *Alford* plea); *United States v. Pinto,* 838 F.2d 1566, 1569 (11th Cir.1988) (per curiam) (within district court's discretion to deny defendant's motion to withdraw plea when facts in indictment satisfied district judge that defendant had defrauded government); *see also United States v. Dayton,* 604 F.2d 931, 938 (5th Cir.1979) (en banc) (district court need only be subjectively satisfied that there was a factual basis for acceptance of the plea; decision reviewed for an abuse of discretion), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980).

Rule 11(f) "requires an adequate factual basis for a guilty plea; it does not require the judge to replicate the trial that the prosecutor and defendant entered a plea agreement to avoid." *Lumpkins,* 845 F.2d at 1451. At the Rule 11 hearing, the trial court identified the elements that must be established to prove the violation of the RICO conspiracy statute.[5] The court articulated that the government must prove that "each defendant knowingly became a member of the conspiracy." In response to the court's question, Morrow stated that he understood the charge. Morrow now argues that both the stipulation he entered with the government and the information presented at the hearing are insufficient to establish a factual basis for the crime because both fail to indicate that he invested the money *knowing* that it came from the illegal proceeds of drug manufacturing and distribution activities. Additionally, he charges that the stipulation does not demonstrate the existence of an agreement that affected interstate commerce.

The factual basis required in the context of proving that Morrow was a member of the conspiracy involves a two step process. *United States v. Truglio,* 731 F.2d 1123, 1133–34 (4th Cir.) (citing *United States v. Morado,* 454 F.2d 167, 174 (5th Cir.), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972)), *cert. denied,* 469 U.S. 862, 105 S.Ct. 197, 83 L.Ed.2d 130 (1984). First, and undisputed here, is the determination that a conspiracy existed. Second,

---

5. To prove a violation of the RICO conspiracy statute, the prosecution must demonstrate:
 1. The existence of a conspiracy,
 2. An overt act in furtherance of the conspiracy,
 3. That the enterprise affects interstate commerce,
 4. That the defendant is associated with the conspiracy and participated in conducting the enterprise's affairs, and

5. That the defendant's participation was through a pattern of racketeering activity, indicated by the commission of at least two racketeering acts.
*United States v. Boldin,* 772 F.2d 719, 727 (11th Cir.1985) (quoting *United States v. Bright,* 630 F.2d 804, 829 (5th Cir.1980)).

to prove that Morrow was a member of the conspiracy, "the government need only show 'slight evidence.'" *Id.* Though the requirements of Rule 11 demand a strong factual basis, in the context of finding one to be a member of a RICO conspiracy the strong factual basis is satisfied by a showing that Morrow possessed "knowledge of the essential nature of the plan." *United States v. Elliot,* 571 F.2d 880, 903 (5th Cir.) (quoting *United States v. Brasseaux,* 509 F.2d 157, 160 n. 3 (5th Cir.1975)), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978).

In *Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), the Supreme Court explained the policy behind the evidentiary standard in proving membership in a conspiracy:

> For it is most often true, especially in broad schemes calling for the aid of many persons, that after discovery of enough to show clearly the essence of the scheme and the identity of a number participating, the identity and the fact of participation of others remain undiscovered and undiscoverable. Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others. Otherwise the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity.

*Id.* at 556–57, 68 S.Ct. at 256 (citations omitted). "Proof of such an agreement may rest upon inferences drawn from relevant and competent circumstantial evidence—ordinarily the acts and conduct of the alleged conspirators themselves." *United States v. Morado,* 454 F.2d at 174.

■ In Morrow's case, the circumstantial evidence and the inferences drawn therefrom provide more than the slight evidence necessary to find him a knowing member of the conspiracy. Regardless of Morrow's knowledge of the full extent of the operation, Morrow was certainly aware that great sums of money, often in the form of currency, needed to be invested. He also clearly knew the money came from unlawful activity and of the need to keep that unlawful activity hidden. He, with the legal assistance of his father, set up at least twelve dummy corporations. The officers of those corporations included his girlfriend, Karen Storm, and his father's legal secretary, as well as members of the operation in charge of manufacturing and distribution of the drug. Morrow visited property that contained lab sites. He asked Storm to lie about the source of the funds for purchase of her property. After a raid on one of the lab sites, he brought Storm papers to sign transferring the property on which that site was located. There was presented at the Rule 11 hearing substantial circumstantial evidence that Morrow knew he was participating in a criminal enterprise and had agreed to do so. The circumstantial evidence satisfies the "slight evidence" needed to show that Morrow was a member of the conspiracy.

Certainly an *Alford* plea raises the question of why the defendant is simultaneously admitting guilt and maintaining innocence.[6] Nevertheless, any Rule 11 proceeding requires that a factual basis for the plea be established and we are unwilling to place more requirements in the context of an *Alford* plea.

Morrow pled guilty to Count One of the indictment, which was read to him during the Rule 11 hearing. The trial court articu-

---

**6.** We agree with the Fifth Circuit's assessment of the plea:

> Although excellent reasons exist for permitting an *Alford* plea, the logic underlying this type of plea is counter-intuitive. The average defendant may have some difficulty reconciling himself to the notion of pleading guilty

while maintaining his innocence.... It is essential that a court accepting an *Alford* plea make every effort to ensure that a defendant recognize precisely what his plea entails.

*United States v. Punch,* 709 F.2d 889, 895 (5th Cir.1983) (footnote omitted).

lated the elements that the government must prove including the element that "each defendant knowingly became a member of the conspiracy." In response to the court's question Morrow stated that he understood the charge. Morrow emphasizes that a court accepting an *Alford* plea must make a careful inquiry into the factual basis. We agree. That careful inquiry occurred in Morrow's Rule 11 hearing.

 We do not see a contradiction between the strong factual basis needed to comply with the mandate of Rule 11(f) and the lesser evidentiary standard discussed above for establishing membership in a RICO conspiracy. The strong factual basis required here is established by the slight evidence needed to prove membership in a RICO conspiracy. The circumstantial evidence that Morrow "manifested an agreement to participate directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes," *Truglio*, 731 F.2d at 1133 (quoting *Elliott*, 571 F.2d at 903), is overwhelming. Furthermore, the interstate effect of the organization is plainly shown by the locations of the labs and investments in land and stock in both North and South Carolina. In sum, the factual basis to support Morrow's plea is sufficient. The judge did not abuse his discretion in accepting the plea as being supported by sufficient facts.

### III.

Morrow argues that the government did not advise the court that the guilty pleas of him and his father were linked as "package pleas," in which one could not plead guilty without the other also so pleading, and thus full disclosure of the plea agreement was not made. Consequently, according to Morrow, it was not possible for the court to determine that his plea was indeed voluntary. Morrow claims that his plea was involuntary and coerced.

 Morrow is right that a plea bargain which involves leniency for a third person "might pose a greater danger of inducing a false guilty plea by skewing the assessment of the risks a defendant must consider." *Bordenkircher v. Hayes*, 434 U.S.

357, 365 n. 8, 98 S.Ct. 663, 668 n. 8, 54 L.Ed.2d 604 (1978). Special care must be taken to determine the voluntariness of the plea in such circumstances. *Harman v. Mohn*, 683 F.2d 834 (4th Cir.1982). As the court did not know that the pleas were linked, Morrow insists that it was unable to exercise any greater level of scrutiny. *See United States v. Daniels*, 821 F.2d 76, 80 (1st Cir.1987) (government's failure fully to disclose plea agreement by informing court that it had made clear to defendant that it would not accept guilty pleas from two codefendants unless he also pled guilty, was not harmless).

 While we may raise eyebrows at the government's failure to inform the court of the linkage of the Morrows' pleas, we find, in the circumstances before us here, Morrow's claim of coercion to be altogether belied by the facts. As the magistrate found, and the district court affirmed, the evidence presented at Morrow's 28 U.S.C. § 2255 habeas proceeding demonstrates that Morrow's plea was not linked to that of his father in an involuntary manner. The lead prosecutor testified that it was his position that no plea agreements would be offered to any other defendant in the case, including Morrow, unless George Morrow, Sr. agreed to plead. Indeed the prosecutor testified that upon Morrow, Sr.'s finally agreeing to plead guilty, Morrow, Sr. stood up, pointed at his son and said, "The only reason I'm pleading to that anyway is to help him." Morrow thus has sought to turn a valid argument upside down.

At the Rule 11 proceeding, the district court specifically asked whether anyone had threatened, persuaded, or induced Morrow into pleading guilty. Morrow responded "No". The court also asked Morrow whether anyone had made any promises of leniency other than those contained in the plea agreement and whether the written plea agreement contained the entire plea agreement in the case. Morrow denied that any promises were made and both he and his attorney affirmed that the plea agreement before the court contained the entire agreement in his case. While not, in

an appropriate case, an insurmountable barrier to a defendant who claims that his plea was coerced, such declarations made in open court carry a strong presumption of veracity. *Blackledge v. Allison*, 431 U.S. 63, 74–75, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977); *see also United States v. Lott*, 630 F.Supp. 611 (E.D.Va.1986) (defendant's testimony at Rule 11 hearing is a formidable barrier in subsequent collateral proceedings unless misunderstanding, duress, or misrepresentation are alleged), *aff'd*, 795 F.2d 82 (4th Cir.1986).

For a violation of Rule 11 to be collaterally attacked, it must result in a complete miscarriage of justice or be inconsistent with the rudimentary demands of fair procedure. *United States v. Timmreck*, 441 U.S. 780, 783–84, 99 S.Ct. 2085, 2087, 60 L.Ed.2d 634 (1979); *see also United States v. Usher*, 703 F.2d 956, 958–59 (6th Cir.1983) (when defendant and his counsel deliberately failed to reveal the existence of other plea bargains to the court, defendant cannot attack the court's failure *sua sponte* to raise the possibility of other conditions). We find no fault with the district court's finding that Morrow entered his plea voluntarily. The decision of the district court is

AFFIRMED.