35 F.3d 557
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Damon DURANT, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Patrick Troy WYNN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Nakomis Cherice HALIBURTON, Defendant-Appellant.
 Nos. 93-5202, 93-5203, 93-5223.
 United States Court of Appeals, Fourth Circuit.
 Argued: April 15, 1994.
Decided: Sept. 2, 1994.
 
 Appeals from the United States District Court for the Western District of Virginia, at Roanoke. James H. Michael, Jr., District Judge. (CR-92-55)
 ARGUED: Deborah C. Wyatt, Charlottesville, VA, for appellant Wynn; Denise Yvette Lunsford, Michie, Hamlett, Lowry, Rasmussen & Tweel, P.C., Charlottesville, VA, for appellant Durant;
 J. Lloyd Snook, III, Snook & Haughey, P.C., Charlottesville, VA, for appellant Haliburton.
 Ruth E. Plagenhoef, Asst. U.S. Atty., Roanoke, VA, for appellee.
 ON BRIEF: Robert P. Crouch, Jr., U.S. Atty., Roanoke, VA, for appellee.
 W.D.Va.
 AFFIRMED.
 Before LUTTIG and WILLIAMS, Circuit Judges, and PAYNE, United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Damon Durant, Patrick Troy Wynn, and Nakomis Cherice Haliburton were convicted of conspiracies in violation of 21 U.S.C. Sec. 846 and 18 U.S.C. Sec. 371:(i) knowingly and intentionally to distribute and attempt to distribute crack cocaine in violation of 21 U.S.C. Sec. 841(a); (ii) knowingly and intentionally to possess crack cocaine with the intent to distribute in violation of 21 U.S.C. Sec. 841(a); and (iii) to travel in interstate commerce to facilitate an unlawful activity in violation of 18 U.S.C. Sec. 1952(a)(3). They also were convicted of the substantive offenses of: (i) aiding and abetting Charmaine Graves to travel in interstate commerce with the intent to promote, manage, establish and carry on an unlawful activity involving a controlled substance, in violation of 18 U.S.C. Secs. 2 and 1952; and (ii) attempting to possess with intent to distribute cocaine base in violation of 18 U.S.C. Sec. 2 and 21 U.S.C. Sec. 841(a)(1).
 
 
 2
 All three appellants claim that one of the jury instructions amounted to a "directed verdict of guilt" because the district court instructed that certain illegal acts "were committed" by one or more of the defendants. The appellants also argue that the instructions were fatally confusing. Durant and Wynn challenge the sufficiency of the evidence to support their convictions. Haliburton, who has not challenged the sufficiency of the evidence, argues that the district court erred in determining the amount of controlled substance to be used in selecting the base offense level which was used to calculate the guideline sentence range. For the reasons set forth below, we affirm all three convictions and the sentence imposed on Haliburton.
 
 BACKGROUND
 
 3
 The conspiracy and substantive charges which are the subject of this appeal arise out of a single shipment of 110 grams of crack from New York to Charlottesville so that it could be distributed in western Virginia. Considering the nature of the issues presented on appeal, it is necessary to recount the evidence presented at trial.
 
 
 4
 Charmaine Graves testified that, on March 4, 1992, in New York City, Durant asked her to deliver crack to Charlottesville where Durant and Wynn would meet her. Graves agreed to transport the crack, and shortly thereafter she, Durant and Wynn drove "downtown" together to "pick it up." Wynn remained in the car, while Durant and Graves went into an apartment building where Durant delivered the shipment to Graves. Following Durant's instructions, Graves travelled by taxi to meet Wynn and Durant at the apartment occupied by Durant's mother. There, Durant, in the presence of Wynn, directed Graves to take the crack to the Old Salem Apartments in Charlottesville. Wynn wrote that address on a piece of paper and gave it to Graves. The apartment was Haliburton's residence and the telephone number was hers. For her services, Graves testified that Durant agreed to pay her $400.[1]
 
 
 5
 Afterwards, Wynn and Durant drove Graves to the bus station, where Durant gave her money to purchase a bus ticket and for taxi fare upon arrival in Charlottesville. Graves, travelling on a one-way ticket from New York to Charlottesville, left at 6:00 p.m., changed buses in Washington, D.C., fell asleep, and awoke at the bus station in Wytheville, Virginia, which is far south of Charlottesville. Almost immediately thereafter, Graves became embroiled in a drug interdiction operation which was unrelated to the organization on whose behalf she was then acting.[2] As a result of that operation, the authorities seized the suitcase containing the crack which was the subject of Graves' mission. They subsequently arrested Graves who admitted the ownership of the suitcase and explained why she was in possession of its unlawful contents, 110 grams of crack.[3]
 
 
 6
 Armed with this knowledge and with the address and telephone number which Wynn had given to Graves, the agents, with the assistance of Graves, arranged for a controlled delivery to Haliburton's apartment of white chocolate altered to look like crack. The agents drove Graves to Charlottesville where she telephoned the number given her in New York by Durant and Wynn. Receiving no answer, Graves took a taxi to Haliburton's apartment. Finding no one there, Graves, acting on police instructions, left a note asking that someone collect her from the bus station.
 
 
 7
 Haliburton arrived at the bus station not long thereafter. She asked Graves: "what took you so long?" and reported that Durant, who had arrived early that morning and was waiting at Haliburton's apartment, had expressed concern about the unexplained delay in Graves' arrival. As Haliburton drove back to the apartment, she regularly checked the rear view mirror and made frequent turns because of "something that happened earlier." Upon arrival, Haliburton told Graves to leave the crack in the car, because she did not want that "stuff in her house." Graves acceded to this request and she and Haliburton entered the apartment where they were met by Durant, Wynn and a man later identified as William Reid.
 
 
 8
 After questioning Graves about the drug interdiction in Wytheville, Wynn and Durant went with Graves to retrieve the crack from the trunk of Haliburton's car. Graves testified that she thought she handed the bag of crack to Wynn, but that she never saw either Wynn or Durant open the bag. Graves then returned to the house.
 
 
 9
 Shortly thereafter, while Durant and Wynn were standing near Haliburton's car, the police arrived. The armed officers left the unmarked police vehicle and, with weapons drawn, they approached Durant and Wynn whereupon, according to Durant, Wynn yelled: "Look out, the man has a gun," and fled[4] to a nearby field and wooded area. He eluded arrest for about 45 minutes. The officer who was chasing Wynn returned the next day to the location where he had last seen Wynn and found the paper bag containing the white chocolate.
 
 
 10
 The challenges to the sufficiency of the evidence will be measured against this evidence on which the jury returned verdicts of guilty against all defendants on all counts.
 
 
 11
 In resolving the sentencing issues raised by Haliburton, we consider also the evidence presented during the sentencing proceedings. There Haliburton testified that, although she was aware that a woman was coming to Charlottesville to see Durant, she did not know that the woman was Graves. Thus, according to Haliburton, her encounter with Graves at the Charlottesville bus station was fortuitous. However, Haliburton acknowledged that she recognized Graves and concluded that she was the unidentified woman whose arrival was awaited by Durant and Wynn. Haliburton also testified that she knew Durant "must be" a drug dealer, but she claimed never to have seen him with crack and to have lacked knowledge of the amounts in which he dealt.
 
 
 12
 At sentencing, the government called Detective Campbell,[5] who testified that, on the night Haliburton was arrested, she admitted knowing that Durant and the others were dealing crack; that Durant's supply source was a Columbian; and that Durant previously had used Graves as a mule. Haliburton also told Campbell that she had tried to avoid the police when she and Graves were en route to the apartment from the bus station. Haliburton also admitted to Campbell that Durant and Wynn were expecting Graves to deliver crack to Charlottesville; that Wynn was planning to distribute some of it in Staunton; and that, when Graves was late in arriving on March 5, Durant and Wynn expressed concern that Graves had taken the crack to her boyfriend instead.
 
 
 13
 Each defendant was held responsible for the entire amount of crack (110 grams) which had been found in the luggage carried by Graves and seized in Wytheville and each defendant was found to be subject to the ten year mandatory minimum sentence required by 21 U.S.C. Sec. 841(b)(1)(A)(iii). Wynn and Durant were sentenced to 174 and 144 months in prison, respectively. Haliburton was sentenced to 135 months of confinement. This appeal followed.
 
 DISCUSSION
 A. The Jury Instructions
 
 14
 All defendants complain that the following passage from the instructions to the jury amounted to a direct verdict:
 
 
 15
 Now in furtherance of this conspiracy and to effect and accomplish the objects of the conspiracy, one or more of the conspirators committed the following overt acts. a.) On or about the 5th of March, 1992, Charmaine Graves traveled from the State of New York to the Commonwealth of Virginia, possessing 110 grams of crack cocaine and intending to deliver it to Damon Durant and Patrick Wynn. .... c.) On the 5th of March, 1992, ... Haliburton picked up Charmaine Graves at a bus station in Charlottesville, drove her to Old Salem Apartments. Graves was carrying the fake crack cocaine. d.) On the 5th of March, 1992, Durant and ... Wynn met Graves at the Old Salem Apartments and took possession of the fake crack cocaine. All of these acts being in violation of Title 21, United States Code, section 846 and Title 18, U.S.C. Sec. 371.
 
 
 16
 (emphasis added). The defendants also challenge the jury instructions in their entirety as confusing because of the foregoing passage and the sequence in which the instructions were presented.
 
 
 17
 With but one exception which is not pertinent here, the defendants did not object to the instructions during the charge conference or after the jury had been instructed. Accordingly, the challenges now presented are reviewed for plain error. United States v. McCaskill, 676 F.2d 995 (4th Cir.1982); Fed.R.Crim.P. 30; Fed.R.Crim.P. 52(b). We, however, have long adhered to the principle that Rule 52(b):
 
 
 18
 "was never intended ... [to] be applied in such a way as to destroy Rule 30 ...." [citations omitted]
 
 
 19
 * * *
 
 
 20
 * * *
 
 
 21
 Accordingly, the plain error rule, 52(b), as an exception to the requirement mandated under Rule 30, is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a "fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has "resulted in a miscarriage of justice or in the denial to appellant of a fair trial" or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."
 
 
 22
 United States v. McCaskill, 676 F.2d at 1002.
 
 
 23
 Our plain error analysis, of course, is governed by United States v. Olano, 113 S.Ct. 1770 (1993), wherein the Supreme Court set forth a four part test for determining whether forfeited error warrants reversal by an appellate court. Under Olano, reversal is not required unless we find: (1) an error (deviation from a legal rule); (2) that is plain (clear under current law); (3) that affects substantial rights (i.e., prejudicial in the sense that the outcome of the proceedings in the district court were affected by the forfeited error); and (4) that seriously affects the fairness, integrity or public reputation of judicial proceedings. Id. at 1777-79; United States v. Cole, No. 93-5021, 1994 WL287171 (4th Cir. June 30, 1994). The defendant has the burden to establish that the forfeited error affected the outcome of the proceedings in the district court. United States v. Olano, 113 S.Ct. at 1778.
 
 
 24
 We first consider whether there was error within the meaning of Rule 52(b). In that regard, the record reflects that the instructions as given did contain the language of which the defendants now complain. However, it is also clear that the district court made this statement while explaining the overt acts which were referred to in the indictment. By the time the challenged statement was made, the district court already had instructed that: (i) the defendants were presumed to be innocent; (ii) the government was required to prove each element of each alleged offense beyond a reasonable doubt; (iii) the jury was the sole arbiter of the evidence and the credibility of the witnesses; and (iv) each count charged a separate crime against each defendant which the jury was to consider separately and individually. Against that background, the district court then proceeded to explain the elements of Count One and, in reciting the overt acts which had been alleged in the indictment, made the statement of which the appellants complain.[6]
 
 
 25
 Considering the instructions in their entirety, as we must, Estelle v. McGuire, 112 S.Ct. 475, 482 (1991), it is neither realistic nor reasonable to believe that the jury interpreted the challenged statement as findings by the district court that the defendants in fact had committed the overt acts alleged in the indictment. By the time it heard the statement, the jury had been fully instructed that it, and it alone, was responsible for deciding the facts and for determining the guilt or innocence of each defendant only if satisfied, as to each defendant, that each element of each count of the indictment had been proved beyond a reasonable doubt. On this record and considering the instructions as a whole, we conclude that the jury could not have considered that it had been instructed to return verdicts of guilt without also concluding that the jury disregarded all of the other instructions it had been given. This we decline to do. Hence, we are unable to find plain error within the meaning of Olano because the instructions as a whole left no room for doubt that it was the responsibility of the jurors to decide whether the government's evidence had proved beyond a reasonable doubt that the overt acts had been committed by the defendants.
 
 
 26
 Our assessment of the record on this issue is underscored by the fact that, at trial, none of the three defense counsel objected to the charge as given. It is reasonable to believe that vigilant counsel would have been alarmed by the challenged statement if, at trial, it had the impact on the jury that is urged on appeal. The fact that none of the three defense counsel received the impression at trial that the district court had taken the issue of guilt or innocence from the jury is persuasive evidence that the jury did not consider that it had been told to return a finding of guilt.
 
 
 27
 No doubt the district court would have clarified the instruction had the challenged statement been brought to its attention. In this sense then, the challenged statement might be regarded as error. Even if we were to so find, we cannot find that the error was so grave as to have denied the defendants a fair trial, or as to have had a probable impact on the jury's findings of guilt. For these reasons, we are satisfied that the appellants have not satisfied the prejudice component of the Olano test. For the same reasons, we are of the view that the challenged statement, even if deemed to be error, did not seriously affect the fairness, integrity or public reputation of judicial proceedings.
 
 
 28
 Nor can we subscribe to the belatedly, and somewhat lamely, asserted contention that the conspiracy instructions as a whole were confusing. To the contrary, the instructions proceeded logically and simply to explain the jury's responsibilities, how they were to be performed, the elements of the offenses, the caveats attached to certain kinds of evidence, the presumption of innocence, and the duty to decide each element of each count as to each defendant measured against the rule of reasonable doubt applied in perspective of the presumption of innocence. Indeed, respecting the conspiracy instruction, which lies at the heart of the appellants' confusion argument, one defense counsel advised the district court: "I like it better from the defense than the standard." The other two counsel did not dissent from that observation. Moreover, considering that the instructions at issue were the ones discussed in the charge conference, that none of the three defense counsel complained there that the instructions, as a whole, were confusing and none of them raised the confusion issue after listening to the instructions as they were given, we reject the argument that the instructions were confusing.
 
 
 29
 In sum, on the record and upon a review of these instructions as a whole, we consider that justice was done.
 
 
 30
 B. The Challenge by Durant and Wynn to the Sufficiency of the Evidence
 
 
 31
 Durant and Wynn challenge the sufficiency of the evidence supporting each of their respective convictions. They bear a heavy burden in that endeavor because a reviewing court must sustain their convictions if, viewing the evidence in the light most favorable to the government and drawing all permissible inferences and credibility determinations in its favor, "any rational trier of fact could have found the essential elements of the crimes charged beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Giunta, 925 F.2d 758, 764 (4th Cir.1991). Therefore, in considering the appellants' arguments, we are not to reweigh the evidence or reconsider the credibility of the witnesses. See Glasser v. United States, 315 U.S. 60 (1942); and United States v. Aragon, 983 F.2d 1306, 1308 (1993). The court is mindful, of course, that mere association with someone who is guilty is insufficient to establish guilt. Giunta, supra.
 
 
 32
 A reviewing court is limited to a consideration of whether the evidence offered by the government has surpassed a minimum threshold. Circumstantial evidence may suffice to support a verdict of guilty on the substantive charges, United States v. Colcough, 549 F.2d 937, 942 (4th Cir.1977); United States v. George, 568 F.2d 1064, 1069 (4th Cir.1978), and to prove the existence of a common purpose and plan with respect to the conspiracy charge. See Glasser, 315 U.S. at 80; Giunta, 925 at 764. Even the uncorroborated testimony of one witness may be sufficient to sustain a verdict of guilty on the charges. United States v. Arrington, 719 F.2d 701, 705 (4th Cir.1983), cert. denied, 465 U.S. 1028 (1984); United States v. Manbeck, 744 F.2d 360, 392 (4th Cir.1984) ("... uncorroborated testimony of an accomplice may be sufficient to sustain a conviction."), cert. denied, 469 U.S. 1217 (1985). With these principles to guide us, we review the challenges to the sufficiency of the evidence on each count.
 
 1. The Conspiracy Convictions
 
 33
 To establish a conspiracy under 21 U.S.C. Sec. 846, the government must prove beyond a reasonable doubt (1) an agreement between two or more persons to violate the federal controlled substances laws; and (2) the defendant's willful joinder in that agreement. See e.g., United States v. Campbell, 980 F.2d 245, 249 (4th Cir.1992), cert. denied, 113 S.Ct. 2446 (1993); United States v. Clark, 928 F.2d 639, 641-42 (4th Cir.1991). A conviction under 18 U.S.C. Sec. 371 requires proof of overt acts in furtherance of the conspiracy. United States v. Yamin, 868 F.2d 130 (5th Cir.1989), cert. denied, 492 U.S. 924 (1990); United States v. Cannon, 811 F.Supp. 1568 (M.D. Ga.1955). Proof of a conspiracy, and of defendant's participation in it, may be established entirely by circumstantial evidence. See e.g., Giunta, 925 F.2d at 764; United States v. Morrow, 914 F.2d 608, 612 (4th Cir.1990). Moreover, it is not necessary that each co-conspirator know all the details on the unlawful plan or the identity of every other coconspirator. See e.g., Morrow, 914 F.2d at 612 (citation omitted); see also United States v. Maldonado-Riveria, 922 F.2d 934, 962 (2nd Cir.1990), cert. denied, 111 S.Ct. 2811 (1991). Rather, it is sufficient to show that the defendant knew of the essential nature of the conspiracy and took action indicating his or her participation in it. See Morrow, 914 F.2d at 612 (citation omitted); United States v. Collazo, 732 F.2d 1200, 1205 (4th Cir.1994), cert. denied, 469 U.S. 1105 (1985). Considering the applicable legal standards, the challenges to the sufficiency of the evidence supporting the conspiracy convictions are unpersuasive.
 
 
 34
 The government's evidence at trial showed that, in March of 1992, Durant and Wynn travelled from Charlottesville to New York. According to Graves, Durant approached her in New York and, with Wynn present, offered to pay her to transport crack to Charlottesville. Wynn and Durant drove Graves to the location where Durant gave her the drugs while Wynn waited in the car. Later, Durant instructed Graves on the address to which the drugs were to be delivered and he provided her with the money for a bus ticket to Charlottesville and for taxi fare from the bus station to the apartment. Wynn wrote the address of Haliburton's apartment and a telephone number on a slip of paper which he handed to Graves. When Graves arrived at Haliburton's apartment, Durant, in the presence of Wynn, questioned her about why she was late and then both Wynn and Durant went out to the car with her to retrieve the crack.[7] If believed, Graves' testimony alone provided sufficient evidence on which to convict Durant and Wynn.
 
 
 35
 Although Durant contends that Graves' testimony was too inconsistent to be believed, the jury, as was its right, obviously found her testimony more credible than that of Durant. "An appellate court will not second guess" a jury's credibility determinations. United States v. Russell, 971 F.2d 1098, 1109 (4th Cir.1992), cert. denied, 113 S.Ct. 1013 (1990); United States v. Stratton, 779 F.2d 820, 828 (2nd Cir.1985), cert. denied, 476 U.S. 1162 (1986).
 
 
 36
 The evidence also showed that, when the police arrived, Wynn ran into the woods and that the police found the substitute crack the next day in the location to which Wynn had fled. This circumstantial evidence lends extrinsic support to Graves' testimony that Durant and Wynn were involved in the conspiracy, the details of which she supplied. The evidence also establishes that overt acts were committed in furtherance of the conspiracy.
 
 
 37
 Considering the evidence in the light most favorable to the government and drawing all permissible inferences in its favor, there was sufficient evidence on which a rational jury could return a verdict of guilt on the conspiracy count.
 
 
 38
 2. Challenges To The Convictions For Attempt To Possess Cocaine Base With Intent To Distribute
 
 
 39
 To sustain a conviction for attempt to possess narcotics with the intent to distribute, the government must prove beyond a reasonable doubt that the defendant (1)knowingly (2)possessed a controlled substance (3)with the intent to distribute it. See e.g., 21 U.S.C. Sec. 841(a)(1); United States v. Samad, 754 F.2d 1091, 1096 (4th Cir.1984). "Actual possession of the drug is not required." Samad, 754 F.2d at 1096. Rather, the government can sustain its burden of proof by showing that the defendant constructively possessed what he thought was a controlled substance by exercising, or having the power to exercise, dominion or control over it. E.g., id.; Collazo, 732 F.2d at 1205, cert. denied, 469 U.S. 1105 (1985). Actual or constructive possession can be established by direct or circumstantial evidence. E.g., United States v. Garcia, 917 F.2d 1370, 1376 (5th Cir.1990).
 
 
 40
 Under this standard, and viewing the evidence in the light most favorable to the government, the evidence was sufficient to sustain the convictions of Durant and Wynn under 21 U.S.C.Sec. 841(a)(1). Graves testified that, shortly after she arrived at Haliburton's apartment, both Durant and Wynn went with her to retrieve the drugs from the trunk of Haliburton's car. Graves was unsure at trial whether she gave the bag to Durant or Wynn, but thought she had given it to Wynn, and independent evidence showed that when the police arrived, Wynn fled into the woods with a package in his hand. The next day, the authorities recovered the substitute crack from the location where Wynn had been observed before eluding the pursuing officers on the preceding evening. That testimony, when considered in perspective of the evidence about the statements and activities of Durant and Wynn in New York, provides a sufficient basis for the jury to have determined that Durant and Wynn attempted knowingly and intentionally to possess what they thought was crack cocaine with the intent to distribute it.
 
 
 41
 3. Challenges To The Convictions For Aiding And Abetting Graves To Travel In Interstate Commerce With The Intent To Carry On An Unlawful Activity Involving A Controlled Substance
 
 
 42
 To sustain a conviction for aiding and abetting one who travels in interstate commerce with the intent to promote, manage, establish, carry on and to facilitate the promotion, management, establishment and carrying on of an unlawful activity, involving controlled substances, in violation of 18 U.S.C. Sec. 1952 and 18 U.S.C. Sec. 2, the government must prove beyond a reasonable doubt that: (1) the particular defendant traveled in, or aided and abetted the travel in, interstate commerce between the places charged in the indictment; (2) the defendant engaged in or aided and abetted in that travel with the specific intent to promote, manage or establish or carry on an unlawful activity; and (3) that the defendant thereafter knowingly committed an act to promote, manage, establish or carry on that unlawful activity. United States v. Monu, 782 F.2d 1209, 1211 (4th Cir.1986). Of course, it is not necessary to prove that such travel was the only reason or motive prompting the travel. See e.g. 18 U.S.C. Sec. 1952.
 
 
 43
 Viewing the evidence in the light most favorable to the government, the record is sufficient to sustain the convictions of Durant and Wynn under 18 U.S.C. Secs. 2 and 1952. Graves testified that Durant and Wynn drove her to the bus station in New York City, where Durant provided the money for her to purchase the bus ticket for the purpose of travelling to Virginia with a supply of crack. Wynn recorded the address and telephone number of the apartment in Charlottesville to which Graves was to deliver the crack. Both men took her to the bus station and both were present when Graves arrived after her illicit journey across state lines. Shortly thereafter, both went to Haliburton's car to "get the stuff." This evidence provides sufficient support for the conviction of Durant and Wynn on the interstate travel count.
 
 C. Haliburton's Sentence
 
 44
 Finding that the offense conduct involved 110 grams of crack, the district court, as recommended in the presentence report, determined that the base offense level for the offenses of conviction was 32. This also was the adjusted offense level because there were no applicable adjustments to be made. The district court correctly determined that the guideline range for confinement at this adjusted offense level was 135 to 168 months and imposed on Haliburton the minimum term of confinement, 135 months.
 
 
 45
 Haliburton argues that the evidence did not establish that she knew the amount of crack involved in the offenses of conviction and that consequently the appropriate adjusted offense level is 12, the guideline minimum for the offenses of conviction. If Haliburton is correct, the guideline range for confinement would be 12 to 18 months.
 
 
 46
 Haliburton's basic position is that, because she did not know the specific amount of crack transported by Graves, her sentence must be determined by using the minimum permissible base offense level--12--for an offense involving crack. We reject her argument.
 
 
 47
 It is true that there was no evidence that Haliburton knew that the conspiracy of which she was convicted involved 110 grams of crack. However, the evidence at trial and at the sentencing hearing establishes beyond peradventure that Haliburton was thoroughly enmeshed in the conspiracy of which she was convicted and that the conspiracy involved 110 grams of crack.
 
 
 48
 Although it is generally true that the jury need not determine the amount of a controlled substance in order to return a conspiracy conviction, United States v. Powell, 886 F.2d 81, 85 (4th Cir.1989), cert. denied, 493 U.S. 1084 (1990), the evidence in this case involved only one transaction and one quantity of crack. And, there was no dispute that the crack weighed 110 grams. Hence, in this case the jury could not have returned a finding of guilty without also determining that the conspiracy involved 110 grams of crack. Of course, for the same reasons, the evidence at trial was sufficient to permit the district court at sentencing to hold Haliburton accountable for the total amount of the shipment in which she involved herself.
 
 
 49
 Moreover, offense levels in drug cases are to be determined with reference to the quantity of drugs involved in the defendant's relevant conduct, not just the amounts for which she is charged and convicted. United States v. Cousineau, 929 F.2d 64, 67 (2d Cir.1991). U.S.S.G. Sec. 1B1.3(a)(1) provides that, in the case of jointly undertaken criminal activity, a defendant is responsible for the conduct of others which occurred during the commission of the offense of conviction, if the conduct was both: (1) in furtherance of the jointly undertaken criminal activity, and (2) reasonably foreseeable in connection with that activity. Relevant conduct is to be determined on the basis of "all acts and omissions committed or aided and abetted by the defendant, for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction." U.S.S.G. Sec. 1B1.3(a)(1) (Nov.1993). Accordingly, if possession of 110 grams of crack constitutes conduct that is "reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake," then Haliburton can have the entire amount attributed to her.
 
 
 50
 The evidence established that Haliburton knew that Durant distributed crack and that Graves was delivering crack to Durant at her apartment. She even admitted knowing that Durant previously had used Graves as a drug courier. Haliburton assisted in the conspiracy by harboring its members who were waiting for the shipment to arrive and by delivering the courier and the shipment to Durant and Wynn knowing that the shipment was to be placed on the market once it was delivered to Durant and Wynn. It makes no difference whether the shipment contained one gram or 110 grams of crack. Haliburton knew she was involved in an unlawful transaction involving controlled substances and she is chargeable with whatever quantity was involved in the shipment in which she involved herself. That amount, whatever it turned out to be, was reasonably foreseeable and there is no doubt that the shipment was in furtherance of the jointly undertaken criminal activity.
 
 
 51
 Haliburton's situation is anticipated by the guidelines which explain that a courier who transports a suitcase knowing that it contains a controlled substance is, for sentencing purposes, accountable for the contents "regardless of his knowledge or lack of knowledge of the actual type or amount of that controlled substance." U.S.S.G., Sec. 1B1.3 (Comment n. 2(a)(1)); United States v. Flores, 5 F.3d 1070 (7th Cir.1993), cert. denied, 114 S.Ct. 884 (1994). United States v. Gadison, 8 F.3d 186 (5th Cir.1993); United States v. Lloyd, 10 F.3d 1197 (6th Cir.1993), cert. denied, 114 S.Ct. 1569 (1994).
 
 
 52
 In a related argument, Haliburton asserts that the district court did not apply the requisite preponderance of the evidence standard in determining the quantity to be used in selecting the base offense level. Haliburton correctly notes that the government has the burden to prove by a preponderance of the evidence that the quantity was reasonably foreseeable. United States v. Goff, 907 F.2d 1441 (4th Cir.1990); United States v. Vinson, 886 F.2d 740 (4th Cir.1989), cert. denied, 493 U.S. 1062 (1990). Haliburton's position is that the district court erroneously relied on the jury's verdict of guilt as establishing the quantity of crack and, in so doing, applied only "a sufficiency of the evidence" standard. This argument has its genesis in the following statement made by the district court:
 
 
 53
 It is the judgment of this court that there was sufficient evidence in the case on which the jury could and did find that Miss Haliburton was as involved in the 110 grams as anybody else. She may not have known that this was exactly 110 grams, maybe it was 50, maybe it was 150, but she certainly knew that there was a quantity of crack cocaine coming in. And using the evidence as a whole, it was reasonable for the jury to conclude that she knew that it was 110 grams that were coming in.
 
 
 54
 The record reflects that the district court made this decision in perspective of the evidence adduced at trial and at the sentencing hearing which, as we have found, was sufficient to support the finding by a preponderance of the evidence. Therefore, even if the district court applied a lesser standard, the error would be harmless.
 
 
 55
 Moreover, as we explained above, the jury's verdict of guilty necessarily determined the amount of controlled substance because the conspiracy involved only one shipment which, according to the undisputed evidence, weighed 110 grams. Hence, on this record the verdict alone could satisfy the government's burden.
 
 CONCLUSION
 
 56
 For the foregoing reasons, we affirm the verdicts of guilty as to each defendant and we affirm the sentence imposed on Haliburton.
 
 AFFIRMED
 
 
 [1]
 At trial, another government witness, Agent Douglas Rhoads, testified that Graves had told him that the agreed amount was $2,000
 
 
 [2]
 On the morning of March 5, 1992, at the Wytheville bus station, special agents of the Virginia State Police along with Wythe County sheriff deputies, using drug-sniffing dogs, were checking for drugs in the luggage being unloaded from arriving buses. Graves left the bus and took the suitcase containing the crack to an adjoining restaurant where she abandoned it. Shortly thereafter, the police who were conducting the interdiction operation found the suitcase at the restaurant, questioned the passengers about it and Graves confessed after first denying ownership
 
 
 [3]
 Laboratory analysis of the seized crack established that it weighed 110 grams and had a street value of approximately $22,000
 
 
 [4]
 The police admitted that they did not have time to identify themselves before Wynn fled and the record shows that, upon arrival, the headlights on the unmarked vehicle were extinguished. Wynn argued at trial, and asserts on appeal, that flight under those circumstances was consistent with innocence. As was its right, the jury rejected this argument
 
 
 [5]
 Haliburton's statements to Campbell were excluded at trial, but were admitted at sentencing without objection
 
 
 [6]
 There is no requirement to prove overt acts to establish a conspiracy under 21 U.S.C. Sec. 846. United States v. Clark, 928 F.2d 639 (4th Cir.1992). However, Count One also charged a conspiracy under 18 U.S.C. Sec. 371 (in respect of interstate travel) and overt action is required to convict under that statute
 
 
 [7]
 Graves' testimony on this point was corroborated by the tape recorded conversation obtained by use of the bodywire worn by Graves. Although the tape was difficult to understand at most points in the transmission, it was clearly heard by the police that "they had the stuff. "